## CIRCUIT COURT OF THE CITY OF NORFOLK

MAMA/TMU, L.L.C.

v.

James H. Miller, Jr.

February 29, 2016

Case No. (Civil) CL15-9608

By Judge David W. Lannetti

Today the Court rules on the Motion for Summary Judgment filed by Defendant James Miller on the Complaint for declaratory judgment filed by Plaintiff MAMA/TMU, L.L.C.'s ("MAMA") as well as MAMA's Motion for Summary Judgment on Miller's Counterclaim. By agreement of the parties, the Court addresses summary judgment on Miller's Counterclaim as though cross-motions for summary judgment were filed. (Tr. 65.) Miller consents to the Court's ruling as if he had filed a cross-motion for partial summary judgment on his Counterclaim as to whether "any asset sale requires a super-majority vote that triggers dissolution." (Tr. 65-66.) Miller does not seek summary judgment on whether "the reorganization plan as proposed serves to circumvent" the settlement agreement." (Tr. 66.) The three issues related to the motions before the Court are as follows: (1) whether the sale or transfer of all, or substantially all, of MAMA's assets requires super-majority approval by MAMA's members; (2) whether the sale or transfer of all, or substantially all, of MAMA's assets and subsequent termination of the LLC against the will of one of its members adversely affects that member's interest as a matter of law, thereby requiring super-majority approval by MAMA's members; and (3) whether the sale or transfer of all, or substantially all, of MAMA's assets and subsequent termination of the LLC circumvent, alter, or amend any provision of the November 4, 2010, agreement between Miller and certain members of MAMA (the "Settlement Agreement"), thereby requiring super-majority approval by MAMA's members.

The Court finds that (1) super-majority approval by MAMA's members is not required for a sale or transfer of all, or substantially all, of MAMA's assets; (2) whether the sale or transfer of all, or substantially all, of MAMA's assets and subsequent termination of the LLC against the will of one of its members adversely affects that member's interest is a factual matter that requires valuation of MAMA; and (3) whether the proposed sale or transfer of all, or substantially all, of MAMA's assets and subsequent termination of the LLC circumvent, alter, or amend the Settlement Agreement cannot be determined, as a matter of law, based on the information the parties provided to the Court.

The Court, therefore, denies Miller's Motion for Summary Judgment on MAMA's Complaint, grants in part and denies in part MAMA's Motion for Summary Judgment on Miller's Counterclaim, and denies Miller's Motion for Summary Judgment on Miller's Counterclaim.

*Background*

In 2007, Miller owned the Tidewater School of Navigation, which was formed to train maritime workers. (Countercl. 1; Tr. 28.) Miller subsequently [formed MAMA, L.L.C., and] enlisted "some investors" to fund the LLC. (Tr. 28.) In 2008, the investors formed a new company, The Maritime University, L.L.C. ("TMU"), which provided marine engineering training and in which Miller was not invited to participate. (*Id.*; Countercl. 2.) In 2009, Miller "filed a complaint against certain members of MAMA[, L.L.C.,] for willful breach of MAMA[, L.L.C.]'s Operating Agreement" and "a derivative action on behalf of MAMA[, L.L.C.,] against the same members for conspiring to misappropriate assets of MAMA[, L.L.C.,] and divert them to their own company, TMU." (Countercl. 2.) The parties ultimately entered into the Settlement Agreement to resolve that litigation. (Tr. 28-29.) Pursuant to the Settlement Agreement, MAMA, L.L.C., and TMU were placed under a single umbrella entity: MAMA/TMU, L.L.C., *i.e.*, MAMA. (*Id.* at 29.)

Pursuant to the Settlement Agreement, Miller is to have "no less than . . . 21.5% profits and membership interest in [MAMA]." (Countercl., Ex. 2, ¶ B.) Further, "Miller will receive an advance ('Advance') against distributions in an amount equal to the greater of (a) 3.5% Gross Revenue of the Combined Entities or (b) $60,000 *per annum*." (*Id.* ¶ C.) The Settlement Agreement also directs that MAMA's Operating Agreement (the "Operating Agreement") will contain negative covenants to prevent, *inter alia,* dilution of Miller's membership interest and circumvention of the Settlement Agreement. (*Id.* ¶ L.) The Settlement Agreement further provides that Miller will have "such voting rights as may be necessary to maintain and enforce the negative covenants." (*Id.* ¶ L.1.)

The Operating Agreement, which was formed subsequent to the Settlement Agreement — although the Settlement Agreement controls

where the two agreements conflict[1] — contains several provisions relevant to this litigation:

> § 2.02 *Adversely Affect a Member's Interest.* Shall mean any action that would reduce or impair a Member's capital interest, right to distributions, (including preferred loan payments and/or non-discretionary advances on distributions), allocation of profits or losses, and/or voting rights.

> § 2.17 *Majority in Membership Interest.* In respect of all Members, a majority of Membership Interests entitled to vote then held by all the Members.

> § 2.33 *Super-Majority in Membership Interest.* In respect of all Members, a vote of eighty percent (80%) of the Membership Interests entitled to vote then held by all the Members.[2]

> § 7.02 *Decisions Requiring Member Approval.* Except with respect to matters expressly requiring otherwise, the approval or concurrence of a Majority in Membership Interest of the Members shall be sufficient to make any and all decisions relating to the Business and affairs of [MAMA]. In addition to any more specific approval requirements set forth in this Agreement, the following shall require the approval or concurrence of a Super-Majority in Membership Interest of the Members:
>   (a) Pledging any assets of [MAMA] or any of its subsidiaries, including but not limited to MAMA[, L.L.C.] and TMU, as collateral for any loans from any member or an Affiliate of a Member.
>   (b) Any action that would Adversely Affect a Member's Interest.
>   (c) Any action that has the effect of circumventing, altering, or amending any provision of the Settlement Agreement.

> § 15.01 *Events Causing Dissolution and Winding Up.* Any of the following events shall cause the dissolution and winding up of the Company:

---

[1] *See* Operating Agreement § 17.07. (Countercl., Ex. 1, § 17.07 ("In the event of any conflict between this Agreement and the Settlement Agreement, the Settlement Agreement shall control.").)

[2] Because the Settlement Agreement requires that Miller receive at least a 21.5% membership interest in MAMA, a Super-Majority in Membership Interest cannot occur without Miller's assent.

(a) The written consent of the Members holding a Super-Majority in Membership Interest of the Members; or

(b) The sale or transfer of all or substantially all of the assets of [MAMA], unless a Super-Majority in Membership Interest of the Members elect to continue [MAMA].

*See generally* Countercl., Ex. 1.

In July 2015, MAMA "entered into an asset purchase agreement" pursuant to which "the Buyer has offered to purchase all the assets and assume all of the liabilities of [MAMA] at a purchase price" of $7,200,000.00 (the "Asset Sale"). (Compl. 2-3.) Although a December 31, 2014, valuation concluded that the valuation of MAMA was $7,200,000, a September 30, 2014, valuation — completed only three months earlier — concluded that the valuation of MAMA was $2,800,000. (Compl. 2.) MAMA noticed a special meeting of its members to vote on approval of the Asset Sale and subsequently terminate MAMA. (*Id.* at 3.) At the time the Complaint was filed, "eleven out of thirteen members comprising a majority in percentage of the membership interest of [MAMA] ha[d] submitted their proxy votes to [MAMA's] management approving the Asset Sale and performing a dissolution and winding up of its affairs." (*Id.*) Following the Asset Sale, the purchaser intends to provide promissory notes to MAMA's members in proportion to their membership interest. (Countercl. 3.) The then-former members of MAMA — other than Miller — then would have the opportunity to contribute their promissory notes to the new entity in exchange for a membership interest in the new entity, resulting in a new entity without Miller as a member. (*Id.*)

MAMA filed suit on September 21, 2015, seeking a declaratory judgment regarding whether the Asset Sale — to sell all, or substantially all, of MAMA's assets — and subsequent termination of the LLC require a simple majority vote or a super-majority vote of its members. (Compl. 6.)

*Positions of the Parties*

A. *Miller's Motion for Summary Judgment on MAMA's Complaint*

Miller moves for summary judgment on MAMA's Complaint for declaratory judgment. In support thereof, he argues that a "Super-Majority in membership interest of [MAMA] is required for approval of the [Asset Sale and termination]" because the Operating Agreement requires super-majority approval for actions that would "reduce or impair a Member's capital interest, right to distributions, (including preferred loan payments and/or non-discretionary advances), allocation of profits and losses, and/or voting rights." (Def.'s Mot. Summ. J. 2, 5 (quoting Operating Agreement § 2.02).) Super-majority approval is required for the Asset Sale and termination, Miller asserts, because, "[a]fter the completion of the [proposed

Asset Sale and termination], each Member's capital interest in [MAMA] would cease to exist. There can be no greater reduction or impairment of a Member's interest than to have it *cease to exist.*" (*Id.* at 2.) Specifically, if the proposed transaction were completed, Miller argues he would lose his "right to distributions from [MAMA]," his "non-discretionary advance distribution equal to 3.5% of [MAMA's] Gross Sales," and his "right to receive an allocation of [MAMA's] profits and losses." (*Id.*)

Miller further argues that he would lose his voting rights and that both the terms of the sale and the valuation of MAMA are "not relevant in determining the voting rights of the members of [MAMA]." (*Id.* at 3.) According to Miller:

> the Operating Agreement requires a Super-Majority vote on *any* action that would Adversely Affect a Member's Interest — not just . . . those actions that fail to provide adequate compensation. Indeed, the vote is required so that each member could make an independent determination of the individual benefit received by the reduction, impairment, or extinguishment of their membership interest.

(*Id.*) Miller argues that the Court, therefore, should find a super-majority vote is required for approval of any transaction that will impair a member's rights, regardless of the amount of compensation received for that impairment, as each member should be entitled to independently determine whether such compensation is adequate. (*Id.* at 4.)

MAMA opposes Miller's Motion for Summary Judgment, asserting the following: (i) "the terms of the Operating Agreement should be given their plain meaning"; (ii) "whether an asset sale causes a membership interest to be 'Adversely Affected,' requires a factual inquiry as to the fair market value of [MAMA]"; and (iii) MAMA is not excluding Miller "from submitting a vote on the Asset Sale." (Pl.'s Br. in Opp'n to Def.'s Mot. Summ. J. 1-2.) MAMA notes that the Operating Agreement defines "Adversely Affect" and asserts that to rule for Miller, the Court would have to ignore that definition. (*Id.* at 3-4.) MAMA argues that "[t]he plain meaning of the definition of 'Adversely Affect' requires that this Court make a factual determination as to value." (*Id.* at 4.) MAMA further distinguishes between adversely affecting a member, which it argues Miller emphasizes, and adversely affecting a member's interest, which is the disputed term in the Operating Agreement. (*Id.* at 4-5.) Lastly, MAMA disputes Miller's claim that MAMA is not permitting him to vote; MAMA insists Miller is mischaracterizing MAMA's position and that it has in fact "delivered a written proxy vote to Miller to submit his vote on this matter." (*Id.* at 6.)

B. *MAMA's and Miller's Motions for Summary Judgment on Miller's Counterclaim*

In its Motion for summary Judgment on Miller's Counterclaim, MAMA argues that the Counterclaim is ripe for summary judgment on the issue of whether "any sale of all [of MAMA's] assets and subsequent [ . . . ] dissolution, *for any value,* triggers language in the Operating Agreement requiring a super majority vote." (Pl.'s Mot. Summ. J. 2.) MAMA further asserts that Miller's circumvention argument is ripe for summary judgment: "the Settlement Agreement cannot be 'circumvented' by conjured provisions that, indisputably, do not exist." (*Id.*) MAMA relies on many of the same arguments it makes in its opposition to Miller's Motion for Summary Judgment on MAMA's Complaint. It asserts that Miller's interpretation of "Adversely Affect" is incorrect in the context of the Operating Agreement and ignores the plain meaning of the words. (*Id.* at 5.) It further argues that the Asset Sale and termination cannot circumvent the Settlement Agreement because nothing in the proposed transaction violates any term of the Settlement Agreement. (*Id.* at 8.) MAMA notes that Miller's argument for circumvention relies on the proposition that Miller "would no longer receive distributions equal to 3.5% of Gross Revenue of [MAMA]," although the Settlement Agreement actually "provides to Miller *'an advance . . . against distributions'.*" (*Id.*) "In other words," MAMA asserts, "if no distribution is made to Members in a given period, Miller would not be entitled to any 'advance' of such distributions. . . . In the event of the dissolution of [MAMA], he, along with the other members of [MAMA], would no longer be entitled to any distributions." (*Id.*)

In response to MAMA's Motion for Summary Judgment on Miller's Counterclaim regarding whether "a sale of [MAMA's] assets and subsequent dissolution would . . . adversely affect a Member's Membership Interest," Miller "incorporates and realleges the arguments and authorities set forth in his Motion for Summary Judgment to the Complaint." (Def.'s Br. in Opp'n to Pl,'s Mot. Summ. J. 2.) Regarding whether "a sale of [MAMA's] assets and then subsequent winding up and dissolution of [MAMA] would [ . . . ] circumvent the Settlement Agreement," Miller argues that there are "material facts genuinely in dispute with regard to whether" such a sale and termination, "followed by reformation under the same name with substantially the same membership — without Mr. Miller — circumvents the Settlement Agreement." (*Id.*)

## Analysis

A. *Legal Standard*

Rule 3:20 of the Rules of Supreme Court of Virginia, which governs motions for summary judgment, states as follows:

> Any party may make a motion for summary judgment at any time after the parties are at issue. . . . If it appears from the pleadings, the orders, if any, made at a pretrial conference, the admissions, if any, in the proceedings, or, upon sustaining a motion to strike the evidence, that the moving party is entitled to judgment, the court shall enter judgment in that party's favor. . . . Summary judgment shall not be entered if any material fact is genuinely in dispute.

Va. Sup. Ct. R. 3:20. A trial court considering a motion for summary judgment must "accept[] as true those inferences from the facts that are most favorable to the non-moving party, unless the inferences are forced, strained, or contrary to reason." *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88, 677 S.E.2d 272, 274 (2009).

Although summary judgment is available in certain circumstances, it is well settled that it "is a drastic remedy, available only when there are no material facts genuinely in dispute." *Id.* "[I]f the evidence is conflicting on a material point or if reasonable persons may draw different conclusions from the evidence, summary judgment is not appropriate." *Id.*

It is the duty of the court to construe and enforce the clear and unambiguous language parties agree to when forming a contract. *See Management Enters., Inc. v. Thorncroft Co.*, 243 Va. 469, 472, 416 S.E.2d 229, 231 (1992). "Where the meaning of a contract is clear, a court will not change its terms, even in order to relieve a party thereto because the contract is harsh and unreasonable." 4A M.J., *Contracts,* § 40 (2013). Only where the language is ambiguous, that is, capable of being understood "in more than one way, or referring to two or more things at the same time," should a court seek to "ascertain the true intention of the parties." *Aetna Cas. & Sur. Co. v. Fireguard Corp.*, 249 Va. 209, 215, 455 S.E.2d 229, 232 (1995). Over time, Virginia courts have developed a three-step methodology for interpreting contracts:

> First, if no patent or latent ambiguities exist, a court should enforce the plain meaning of the contractual language without resort to extrinsic evidence. Second, if an ambiguity exists, a court should still enforce the contract if the real meaning of the ambiguous provision can be discerned from extrinsic evidence. Third, if an ambiguity renders the alleged agreement too indefinite even after the consideration of extrinsic evidence of the court to determine the parties' intent, the contract cannot be enforced due to the absence of any discernable meeting of the minds.

*Smith v. Smith*, 43 Va. App. 279, 387, 597 S.E.2d 250, 254 (2004) (citing *Eure v. Norfolk Shipbuilding & Drydock Corp.*, 263 Va. 624, 632, 561

S.E.2d 663, 667 (2002); *Cascades N. Venture, Ltd. P'ship v. PRC, Inc.*, 249 Va. 574, 579, 457 S.E.2d 370, 373 (1995); *Allen v. Aetna Cas. & Sur.*, 222 Va. 361, 364, 281 S.E.2d 818, 820 (1981)).

The fact that the parties disagree as to a term's interpretation does not automatically render that term ambiguous. *Douglas v. Hammett,* 28 Va. App. 517, 523, 507 S.E.2d 98, 101 (1998). "When the terms of the parties' contracts are unambiguous, the interpretation of those terms presents a question of law." *Waikoloa, Ltd. P'ship v. Arkwright,* 268 Va. 40, 46, 597 S.E.2d 49, 53 (2004). When construing the terms of a contract, courts must "give effect to every part thereof." *Roanoke Marble & Granite Co. v. Standard Gas & Oil Supply Co.*, 155 Va. 249, 254, 154 S.E. 518, 520 (1930). Furthermore, no word in a contract will "be treated as meaningless where it can be given a reasonable meaning. Parties are not presumed to have included a provision of no effect." *Ross v. Craw,* 231 Va. 206, 214, 343 S.E.2d 312, 317 (1984).

## B. *Discussion*

The Court has considered the pleadings, oral argument at the December 21, 2015, hearing, and applicable authorities.

### 1. *A Super-Majority in Membership Interest Is Not Required for a Sale or Transfer of All, or Substantially All, of MAMA's Assets*

Miller asserts that MAMA misstates his Counterclaim argument, claiming that Miller asks the Court to find that *any* sale of substantially all of MAMA's assets, followed by a dissolution and winding up, substantially affects a member's interest and, therefore, requires a Super-Majority in Membership Interest. (Miller Post-Hearing Br. 3.) Miller argues that the Counterclaim actually seeks "declaratory relief aris[ing] out of the particular facts of the *specific sale, dissolution and reorganization plan"* proposed by MAMA. (*Id.*) Nevertheless, because Miller's underlying argument regarding how the Asset Sale and termination adversely affect his membership interest applies to any termination of MAMA, the Court finds it appropriate to address Miller's Counterclaim as if it asks the Court to find that super-majority approval is required for the sale of all, or substantially all, of MAMA's assets, followed by dissolution and winding up.

Where the terms of a contract are clear and unambiguous, the Court must give effect to those terms. *Thorncroft,* 243 Va. at 472, 416 S.E.2d at 231. The Operating Agreement is a contract between MAMA's members, including Miller, that governs MAMA's operations. The agreement specifically identifies the situations in which a Super-Majority in Membership Interest is required for approval of an action, and the agreement further states that, "[e]xcept with respect to matters expressly requiring otherwise, the approval or concurrence of a Majority in Membership Interest of the Members shall

be sufficient to make any and all decisions relating to the Business and affairs of [MAMA]." (Countercl., Ex. 1, § 7.02.)

The Operating Agreement identifies two separate conditions that trigger dissolution and winding up of MAMA: (1) the written consent of the members holding a Super-Majority in Membership Interest of the Members (*id.* § 15.01(a)); and (2) the sale or transfer of all, or substantially all, of MAMA's assets, unless a Super-Majority in Membership Interest of the Members elect to continue MAMA (*id.* § 15.01(b)). Notably, the Operating Agreement contemplates the possible sale or transfer of substantially all of MAMA's assets as a catalyst to terminating the LLC, but only requires a Super-Majority in Membership Interest to continue operation of the LLC following such a sale or transfer. Moreover, the sale or transfer of substantially all of MAMA's assets is addressed in the agreement separate and distinct from the requirement of super-majority approval for continuation of the LLC after the sale or transfer of all, or substantially all, of its assets. Further, the Operating Agreement expressly requires super-majority approval of MAMA's members to pledge corporate assets as collateral for a member loan without requiring such approval for the sale or transfer of corporate assets. (*Id.* § 7.02(a).) The Court must give effect to the unambiguous terms of the contract and presumes that all words are intentional and carry meaning. *Ross,* 231 Va. at 214, 343 S.E.2d at 317.

Because the terms of the Operating Agreement addressing the sale or transfer of substantially all of MAMA's assets are unambiguous, the Court interprets these terms as a matter of law. Although Miller relies on *In re NextMedia Investors, L.L.C.,* 2009 Del. Ch. LEXIS 76 (2009), to support the proposition that *any* dissolution of an LLC adversely affects a dissenting member, the Court need not analyze this non-binding authority because the language of the Operating Agreement is unambiguous. Giving effect to all terms included in the agreement, the Court finds *inclusion* of a super-majority-approval requirement both for winding up MAMA *without* the prior sale of substantially all of its assets and for the continuation of MAMA following the sale of substantially all of its assets to be significant. Likewise, the *absence* of a requirement that the sale of substantially all of MAMA's assets be approved by a Super-Majority in Membership Interest is noteworthy. The Operating Agreement is clear that "[e]xcept with respect to matters expressly requiring otherwise, the approval or concurrence of a Majority in Membership Interest of the Members shall be sufficient to make any and all decisions relating to the Business and affairs of [MAMA]." (Countercl., Ex. 1, § 7.02.) Because the terms of the Operating Agreement do not expressly require a Super-Majority in Membership Interest to approve the sale or transfer of substantially all of MAMA's assets — and particularly in light of the fact that the agreement *does* expressly require such approval for related actions — the Court finds that the Operating

Agreement does not require super-majority approval of the members to sell or transfer all, or substantially all, of MAMA's assets.

The Court recognizes that the Operating Agreement requires super-majority approval to terminate MAMA *prior to* selling all, or substantially all, of its assets (*id.*, § 15.01(a)) but only majority approval to terminate MAMA *after* selling all or substantially all of its assets (*id.*, § 15.01(b)). Termination, therefore, can occur after only majority approval of the sale or transfer of all, or substantially all, of MAMA's assets, assuming that the membership interest of a dissenting member is not adversely affected. Nevertheless, the Court cannot re-write the agreement. The available pathway to termination via majority-only voting — as expressed in the language of the agreement — also indicates that a sale or transfer of all, or substantially all, of MAMA's assets does not *per se* adversely affect a dissenting member.

### 2. *The Determination of Whether the Asset Sale and Termination of MAMA Adversely Affects Miller's Membership Interest Is Not Ripe for Summary Judgment*

As discussed *supra,* the Operating Agreement does not require super-majority approval of MAMA's members to sell or transfer all, or substantially all, of MAMA's assets and subsequently terminate the LLC. Among its specific provisions regarding super-majority approval, the Operating Agreement expressly requires a Super-Majority in Membership Interest to approve actions by MAMA that "would Adversely Affect a Member's Interest." (Countercl., Ex. 1, § 7.02(b).) "Adversely Affect a Member's Interest" is defined by the agreement as "any action that would reduce or impair a Member's capital interest, right to distributions, (including preferred loan payments and/or non-discretionary advances on distributions), allocation of profits or losses, and/or voting rights." (*Id.* § 2.02.)

Although the sale or transfer of substantially all of MAMA's assets followed by termination of the LLC without the approval of a member arguably *always* adversely affects that member's interest, by, *inter alia,* eliminating voting rights and the right to future distributions, the Court finds this argument unpersuasive. As discussed in the previous section, this position is not supported by the unambiguous language of the Operating Agreement. The Court instead finds that the compensation received by the dissenting member is relevant to the determination of whether that member's interest ultimately is adversely affected by the transaction. The parties agree that the fair market value of MAMA is a matter of disputed fact to be determined at trial. (Tr. 45, 48.) Because a genuine issue of material fact exists as to MAMA's value and, therefore, as to the compensation Miller will receive in exchange for his membership interest in MAMA the Court finds that this issue is not ripe for summary judgment.

### 3. The Determination of Whether the Asset Sale and Termination of MAMA Effectively Circumvent, Alter, or Amend the Settlement Agreement Is Not Ripe for Summary Judgment

At the hearing and in their briefs, the parties provided very little information regarding the post-dissolution intentions of MAMA's members other than Miller. In its Motion for Summary Judgment on Miller's Counterclaim, MAMA offers the following brief recitation of allegedly undisputed facts related to the claimed circumvention of the Settlement Agreement: (1) the Settlement Agreement provides that "Miller will receive an advance . . . against distributions in an amount equal to the greater of (a) 3.5% of Gross Revenue of the Combined Entities or (b) $60,000 *per annum*"; (2) "[t]he Settlement Agreement is silent on matters of the Company's sale of its assets, winding up, and dissolution"; and (3) "[i]n his Counterclaim, Miller . . . asserts that a sale of all [of MAMA's] assets and the subsequent winding up of its affairs would 'circumvent' the settlement agreement because 'upon information and belief' Mr. Miller would no longer 'receive distributions equal to 3.5% of Gross Revenue of the Combined Entities'." (Pl.'s Mot. Summ. J. 4-5.) In its response brief, as well as on several other occasions, Miller references a "reformation" of the LLC following MAMA's dissolution. (Def.'s Br. in Opp'n to Pl.'s Mot. Summ. J. 2.)

The Court has not been provided sufficient information regarding the dissolution and alleged "reformation" of MAMA, including information related to issues that at least one party asserts are relevant to the determination of whether the Settlement Agreement was circumvented. The Court, therefore, finds that neither party has provided the Court with sufficient undisputed facts to rule on summary judgment on this issue at this time.

### Conclusion

For the foregoing reasons, the Court denies Miller's Motion for Summary Judgment on MAMA's Complaint, grants in part and denies in part MAMA's Motion for Summary Judgment on Miller's Counterclaim, and denies Miller's Motion for Summary Judgment on Miller's Counterclaim.